(36 App. Div. 140.)

GIBBONS v. BRUSH ELECTRIC ILLUMINATING CO.

(Supreme Court, Appellate Division, First Department.   January 20, 1899.)

1. MASTER AND SERVANT—FELLOW SERVANT.
    A foreman in charge of a gang employed in lowering frames from the
    tops of electric light poles, and who orders the work done in a manner
    which exposed one of the employés to unnecessary danger, resulting in
    his injury, is a fellow servant of such employé.

2. SAME—KNOWLEDGE OF DEFECT.
    A foreman of an electric light company knew that a frame had fallen
    from the top of one of the poles on account of the defective condition of
    the frame, and that new frames had been made, and were being sub-
    stituted for others, of the same pattern as the one which fell, and he
    went up the pole and examined one of the latter before ordering plaintiff
    to remove it.   *Held*, that he knew of the defective condition of such frame.

3. SAME—ASSUMPTION OF RISK.
    An employé of an electric light company, engaged in removing lamps
    from their poles, who knew that all lights of that pattern were being re-
    moved, and others substituted for them, assumes the risk of injury caused
    by the defective condition of the lamp.

Appeal from trial term, New York county.

Action by Peter Gibbons against the Brush Electric Illuminating
Company.    Judgment for plaintiff, and defendant appeals.    Re-
versed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY,
PATTERSON, and O'BRIEN, JJ.

A. Stickney, for appellant.

H. Nathan, for respondent.

VAN BRUNT, P. J.   This action was brought to recover damages sustained by the plaintiff as the result of a fall from the top of one of the electric light poles maintained by the defendant.   It appears from the evidence that for 18 years prior to the happening of the accident above mentioned the plaintiff had been engaged as a lineman, having been employed by the defendant for several years, and by other companies before that.   The duties of a lineman were the stringing of wires, setting and removing poles, putting in instruments, helping to put them in order, making repairs, removing defective appliances and substituting new ones, putting up and taking down lamps, and putting up and taking down frames and hoods, and fixing anything that was out of order.   It appeared that in 1892 one of the poles upon the defendant's line was found to be in a faulty condition, and one of the defendant's workmen was directed to reset it.   On examination, finding the screws attaching the frame of the lantern to the cap at the top of the pole to be rotten, he lowered the pole, frame, and hood together by a block and fall. The frame he carried to the defendant's office for the inspection of the assistant superintendent, who examined the same, and found the screws to be eaten away, and not capable of the strain they were called upon to hold.   He then made a report to the main office, but what were the contents of such report nowhere appears except that the assistant superintendent testified that he reported to the defendant the condition of affairs he then discovered.   He afterwards sent a man to inspect the whole line, and subsequently made a written report to the defendant; but what were the results of such inspection or the nature of his report thereon is not stated. In September, 1895, a frame at Twenty-Third street, similar to the one in question, fell, and the screws were found by one Mandeville, a foreman of the defendant, to be in a rusty condition.   The defendant thereupon set to work to get out patterns, and to have new frames made, and to change all the lamps upon the poles from Fourteenth to Thirty-Fourth street which were of similar construction.   On the morning of the 31st of March, 1896, the plaintiff and other workmen in the employ of the defendant were sent out with Mandeville, as foreman, to take down all the frames, hoods, and lamps on the defendant's line along Broadway from Fourteenth to Thirty-Fourth street, and to put up new frames, hoods, and lamps.   The gang had with them all the appliances for the doing of this work, consisting of shear poles, ropes, etc., and also some new frames to substitute for the old ones which they were ordered to take down.   The gang went to the pole situated at Broadway and Thirty-Fourth street, and Mandeville, the foreman, went up the pole, "and examined the whole thing, before the work was started," although he testifies that from such examination he could not tell whether the screws or bolts were in bad condition or not, and he further testifies that nobody ever told him that they were defective.   But it appears from the evidence that he had the

same knowledge that anybody else had on the subject, namely, what was derived from the falling of the lamp in Twenty-Third street. After having made such examination, Mandeville instructed the plaintiff to ascend the pole, to take the lamp down, and lower the hood, informing him at the same time that he would get the shear leg ready for taking down the frame. The pole in question was about 24 feet high, and equipped with steps on each side. On the top sat the frame, a cap going over the top of the pole, which held the hood and lamp. The weight of this structure was from 350 to 400 pounds. The plaintiff, in accordance with the foreman's instructions, ascended the pole, removed the lamp from the frame, and lowered it. This done, with his left foot on one of the steps of the pole, he put his right leg through the frame into the space left vacant by the removal of the lamp, resting (as he claims) the weight of his body wholly on the cap at the top of the pole, and his leg touching all around the pole where he was working. In this attitude, and using both hands, he unscrewed the bolts on the Broadway side of the hood; then, switching his body over a little, and leaning back to get at the bolt over his head, he commenced to remove the bolts fastening the other side of the hood to the frame. He had removed two of such bolts, when the frame gave way, and he fell to the ground, the hood and part of the frame falling with him. He testified that the fall was occasioned by the screws attaching the frame to the cap breaking or pulling off; but it appeared upon cross-examination that this was a mere conclusion, as it was founded upon the fact that he could not see any other way in which it could come down. The screws were examined by the foreman, and also by two police officers present, and were found to be rotten, rusty, and in bad condition. Upon this proof the case was submitted to the jury, who found a verdict in favor of the plaintiff, and from the judgment thereupon entered, and from an order denying motion for new trial, this appeal is taken.

Under these circumstances we fail to find any ground upon which the liability of the defendant can be based. It is undoubtedly the duty of an employer to furnish to his employé proper appliances with which to work, and a safe place in which to carry on the work; but this rule is necessarily qualified by the nature of the work to be done and the circumstances under which it must be performed. It appears from the evidence in this case that the defendant furnished all the appliances necessary to take these frames down with perfect safety,—appliances with which all the other frames upon the line were removed. The foreman was competent to do the work, and, if any negligence occurred, it was in the manner in which he directed the work to be done, and the situation in which he directed the plaintiff to put himself in so doing. This, under all the authorities, was clearly the negligence of a fellow servant. Cullen v. Norton, 126 N. Y. 5, 26 N. E. 905. If the foreman proceeded to do this work in a manner which exposed the plaintiff to unnecessary danger, that was not the negligence of the defendant, but of the foreman, who was a fellow workman of the plaintiff. This is the principle upon which the case of Cullen v.

Norton, above cited, was decided. But it is urged that neither the foreman nor the plaintiff had any knowledge in regard to the insecure condition of the screws upon the frame in question. It is to be observed that, according to the report, Mandeville had all the knowledge that anybody else had in regard to the condition of these screws. He knew of the falling of the lamp in Twenty-Third street. He knew that new frames had been made and were being substituted because of what was discovered upon the falling of that lamp. He himself went up and examined the frame in question, and then proceeded to take it down in the manner above described. It is true that he says he could not tell from examination whether these screws were rusty or not; but it is quite difficult to understand what he went up for if he knew that he could not find out anything as to their condition, as he must have been as well aware of that fact before he ascended the pole as afterwards. It was only after such examination that he ordered the plaintiff to ascend the pole, and remove the frame in sections. It was because of this direction that the accident happened to the plaintiff, —precisely the same as in the case of Cullen v. Norton, supra. It was the direction of the superintendent to the deceased in that case to go to work in the neighborhood of an undischarged blast, which went off, and killed the workman. The plaintiff knew that these old lamps were being taken down, and new ones substituted. He had no reason to suppose that this work was being done as a mere pastime, but must have known that it was in pursuance of some intelligent purpose. In the case of Arnold v. Canal Co., 125 N. Y. 15, 25 N. E. 1064, where one of the servants of the defendant company was injured in coupling cars, such injury being caused by the defective condition of one of the couplings, it was held that that afforded no ground of liability upon the part of the company, inasmuch as it was the duty of the plaintiff to handle defective as well as uninjured cars. The coupling was directed to be done in order that the disabled car might be set aside for repairs, and the court held that whether the plaintiff knew of that defect or not was immaterial, that one of the purposes of his employment was to handle disabled cars, and that, if he did not know what its condition was, he was bound to assume that it might be disabled, and govern his actions accordingly. To the same effect is McCosker v. Railroad Co., 84 N. Y. 79.

Applying the principle of these cases to the case at bar, the business of the plaintiff was to assist in repairing these lines for illumination, and in the removal of the lamps, hoods, and frames; and when he was sent to take down these frames, and substitute others, he was, to use the language of the case of Arnold v. Canal Co., above cited, bound to assume that they might be disabled, and to govern his actions accordingly. Under this rule there seems to be no foundation for a charge of negligence against the defendant, it having done all that the law required, namely, the furnishing of proper appliances and competent workmen for the performance of the work. There does not seem, therefore, to have been any proof

of defendant's negligence, and it was error to submit that question to the jury.

We think that the judgment and order appealed from should be reversed, and a new trial ordered, with costs to appellant to abide the event.   All concur.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.